In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 24-1648

QUALITY CUSTOM DISTRIBUTION SERVICES LLC,

*Plaintiff-Appellant,*

*v.*

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 710,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-01534 — **Nancy L. Maldonado**, *Judge.*

———————

ARGUED FEBRUARY 10, 2025 — DECIDED MARCH 13, 2025

———————

Before EASTERBROOK, ROVNER, and LEE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* A collective bargaining agreement between the Teamsters Union and Quality Custom Distribution, governing the work of employees who provide supplies to Starbucks, provides that workers in the top 80% of the seniority list are guaranteed at least 40 paid hours per week. During the early months of the COVID-19 pandemic (declared in March 2020) many Starbucks stores in or near Chicago closed or greatly reduced their hours. During these

months the most senior employees averaged only 30 hours a week, and the Union demanded that the employer make good the 40-hour minimum. It refused, pointing to an exception to the promised floor for Acts of God.

The dispute went to an arbitrator, who ruled in the Union's favor. The arbitrator thought that Acts of God may include epidemics but added that "the human element has been a major contributing factor" to the lost work. The Governor of Illinois issued orders closing some food businesses and allowing others to operate only for carry-out orders, plus open-air sit-down service. The Governor's orders were not themselves Acts of God, the arbitrator decided. It was the governmental response, and not the disease on its own, that led to the reduction in work—and the act-of-God proviso does not cover regulations and executive orders, as the arbitrator understood the language.

In this suit under federal labor-relations law the employer asked the district court to nullify the arbitrator's decision. The judge declined. 722 F. Supp. 3d 817 (N.D. Ill. 2024). The employer now asks us for the same relief. We decline too.

The reason is simple. Parties who choose arbitration elect to have an arbitrator, rather than a judge, resolve disagreements about the meaning of contractual words. As long as the arbitrator interprets the contract—rather than pursuing what the Supreme Court has called "his own brand of industrial justice", *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)—the award must stand. There can be no doubt that this arbitrator interpreted this contract. The phrase "Act of God" is in the contract. The omission of a contractual definition necessitated interpretation. The arbitrator concluded that an "Act of God" is a harmful event in the natural

world, such as a flood or tornado, rather than an effect of statutes, regulations, and executive orders.

If the employer had contended that workers' hours would have fallen below 40 during 2020 even if the Governor had not issued any orders, that would have posed a difficult question for the arbitrator. A novel virus may qualify as an "Act of God," at least until the medical profession figures out how to respond. Even five years later people do not agree on how the pandemic would have affected businesses and the populace at large had government not intervened. Some nations, such as Iceland and Sweden, regulated lightly, and the hospitality business there remained open. Other nations, such as China, New Zealand, and the United Kingdom, issued sweeping stay-at-home orders that shuttered restaurants and cafes. Illinois chose an intermediate stance, disallowing indoor dining while permitting open-air dining and takeouts. The state's regulatory regime followed not simply from the existence of a novel virus but also from independent decisions, made in light of medical capacity and other considerations. COVID-19 kicked off the chain of causation but was not the sole factor in the employees' loss of work.

Instead of contending that the virus plus people's individual responses would have cut workers' hours, the employer elected to base its argument on the effect of the Governor's orders. At oral argument, counsel for the employer told us that, in his view, anything beyond an employer's control is an "Act of God." That is hardly a common understanding: it would make every Act of Congress an Act of God, considerably elevating the legislature's stature.

You do not need to be a student of Ludwig Wittgenstein to know that the meaning of language lies in how an audience

understands words. See Saul A. Kripke, *Wittgenstein on Rules and Private Language* (1982). Language is a social endeavor. A phrase such as "Act of God" in a collective bargaining agreement speaks to multiple audiences, including employers, unions, and arbitrators. Quality Custom Distribution has offered one lawyer's understanding (anything beyond an employer's control) but has not tried to show that this is a *normal* understanding, let alone that it is the *only* understanding that addressees of these words hold. It has not contended that the context of that phrase in this agreement supplies a special meaning. It has not examined dictionaries or a linguistic corpus. It has relied entirely on counsel's own understanding, which differs from the arbitrator's.

Year after year, in case after case, litigants insist that an arbitrator erred in adopting one view rather than another from the panoply of possible interpretations. Year after year, in case after case, we reject that assertion and hold that the choice belongs to the arbitrator. Courts do not ask whether arbitrators interpreted the contractual language correctly; it is enough that they tried to implement the parties' bargain. We put it this way in one opinion that has been quoted frequently:

> As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award … is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive. By making a contract with an arbitration clause the parties agree to be bound by the arbitrators' interpretation of the contract. A party can complain if the arbitrators don't interpret the contract—that is, if they disregard the contract and implement their own notions of what is reasonable or fair. A party can complain if the arbitrators' decision is

> infected by fraud or other corruption, or if it orders an illegal act. But a party will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation. Granted, the grosser the apparent misinterpretation, the likelier it is that the arbitrators weren't interpreting the contract at all. But once the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption and the arbitrators haven't ordered anyone to do an illegal act.

*Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987) (citations omitted). The Supreme Court has said the same thing. See, e.g., *Major League Baseball Players Association v. Garvey*, 532 U.S. 504, 509–10 (2001); *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 571–73 (2013). See also, e.g., *American Zurich Insurance Co. v. Sun Holdings, Inc.*, 103 F.4th 475 (7th Cir. 2024).

This is an easy case—so easy that it appears to fall within the norm that a litigant must pay the other side's legal fees when it asks a judge to override an arbitrator's interpretive decision. *Hill* and *American Zurich* reflect this norm. See also, e.g., *Retzios v. Epic Systems Corp.*, 126 F.4th 1282 (7th Cir. 2025); *BLET GCA UP v. Union Pacific R.R.*, 988 F.3d 409 (7th Cir. 2021); *Production & Maintenance Employees v. Roadmaster Corp.*, 916 F.2d 1161 (7th Cir. 1990). As we observed in *Retzios*, "arbitration is designed to simplify and expedite the process of dispute resolution. It cannot serve that purpose if one party to the agreement resists tooth and nail. When that happens, the arbitration clause *exacerbates* the conflict: instead of one suit in court, we get one suit in court (about whether to arbitrate), a second controversy before the arbitrator, and potentially a third in court when the loser tries to get a judge to override the outcome or forces the winner to file suit seeking the award's enforcement. Turning one dispute-resolution process

into two or three makes arbitration its own enemy." 126 F.4th at 1286 (emphasis in original).

An award seems especially appropriate when a litigant's conduct imposes unnecessary costs on the court, as Quality Custom Distribution has done by causing us to doubt that it could sue at all. Its brief, like its complaint in the district court, gives its full name as "Quality Custom Distribution" without any corporate identifier. Yet in response to the Union's counterclaim in the district court seeking to confirm the award, Quality Custom Distribution described itself as a division of Golden State Foods Corp. A division is not a juridical entity. Any suit must proceed in the name of the corporation. Fed. R. Civ. P. 17(a), (b); see also *Mutual Assignment & Indemnification Co. v. Lind-Waldock & Co.*, 364 F.3d 858, 860 (7th Cir. 2004). The Circuit Rule 26.1 disclosure statement in this appeal describes "Quality Custom Distribution" as a subsidiary of Golden State Foods, a Delaware corporation, but the absence of any corporate identifier such as "Incorporated" or "Corporation" led us to wonder whether it was a division, as it had described itself in the district court. And a search for "Golden State Foods" in Delaware turned up Golden State Foods International, Inc., Golden State Foods LLC, and Golden State Foods Midwest, LLC, but no "Golden State Foods Corp." All very mysterious.

We ordered Quality Custom Distribution to file a post-argument statement concerning its identity. It then told us that its legal name is "Quality Custom Distribution Services LLC" and that, until December 2024, its name had been "Quality Custom Distribution Services Inc." Its disclosure statement thus was incorrect, for the statement omitted two words from its corporate name at the time of the brief's filing—and the

firm did not bother to tell the court about the reorganization and name change last December. (We have corrected the caption.) The post-argument statement also asserts that its "parent" is "Golden State Foods LLC", though limited liability companies have members rather than parents. The judges and their staffs wasted time trying to understand the incomplete and inconsistent statements. We cannot fathom why a litigant should be so insouciant about its own name and the names of its affiliates. Judges must be able to rely on the disclosure statements in order to check for conflicts and potential disqualifications.

The judgment of the district court is affirmed. Appellant has 14 days to show cause why the court should not award sanctions under Fed. R. App. P. 38, including but not necessarily limited to an award of attorneys' fees.